SAMUEL SPROAT VS. OTTO C. DURLAND.

1. In an injunction proceedings brought to restrain an adverse party from interfering with the possession of a homestead claimant, the courts will inquire into the status of parties far enough to determine whether or not the parties claiming possession have, under the laws of congress, a right as settlers upon the land.

2. A person settling upon lands segregated from the public domain by a homestead entry, is a mere trespasser.

3. No settlement right can be obtained upon a homestead by the purchase of the improvements of another.

4. A right to occupy a tract of land under the homestead laws of the United States as a settler must be based, either upon a homestead filing, or a settlement made within three months prior to an adverse filing.

5. A settlement made upon land covered by an existing entry, confers no right whatever where such entry is cancelled as a result of a contest for a preference right.

6. Where a temporary restraining order is granted in favor of a party, who has no right under the law to the occupancy of land, and, upon final hearing, such fact is· made to appear, *held*, not error for the trial court to dissolve such order.

7. While the jurisdiction of a court of equity by way of mandatory injunction is rarely exercised, yet it is too well established to admit of a doubt.

8. The courts have the right to deal with the question of possession as between settlers upon the public domain.

9. When it is ascertained that a person claiming the right to the use and occupancy of a tract of land, the title to which is still in the United States, is, under the laws of Congress, a mere trespasser. It is the duty of the courts having jurisdiction to give the proper party the possession of the land upon which the trespass is committed.

10. If it be found that a person asserting a claim to public land is a mere trespasser, it is the duty of the courts to issue a mandatory injunction, restraining him from the further unlawful occupancy of the land.

11. Where a mandatory injunction is issued, the court may compel an obedience to such order.

*Error from Oklahoma County.*

*Amos Green & Son* and *Harry St. John* and *J. L. Brown*, attorneys for appellant.

*Everest & Sanford* and *W. S. Field*, attorneys for appellee.

Statement of the case, finding of facts and opinion by

DALE, C. J.:    May 1st, 1893, appellant, Samuel Sproat, applied for and obtained from the district judge of Oklahoma county, sitting at chambers, a temporary restraining order against the appellee, Otto C. Durland, which order restrained said Durland, and all persons acting under him, from in any manner trespassing upon the northeast quarter of section thirty-four, township twelve, north of range three west, or turning any cattle therein, or building any fence thereon, or in any wise interfering with the possession of Sproat in and to said land, except twenty acres theretofore occupied by one Kate A. Woodruff, until the further order of the court; and that the defendant be notified to appear before the court, on May 3, 1893, at noon, or so soon thereafter as the court could hear the matter, and in said order also required Sproat to give bond in the sum of two hundred dollars ($200.00) to the defendant in said proceeding.

The above order was issued upon the *ex parte* showing by affidavit of Sproat, which affidavit is as follows:

"Comes now the plaintiff and for cause of action against the defendant, states:

"1.    That upon the 21st day of April, 1893, the northeast quarter of section thirty-four, township twelve, north of range three west was held by homestead entry thereon by one Kate A. Woodruff, and at that time the defendant, Otto C. Durland, had a contest pending in the United States land department

against the said homestead entry of Kate A. Woodruff, upon the ground that Kate A. Woodruff was not qualified to make homestead entry of said land, by reason of the fact that she had entered upon the same after March 2, 1889, and before noon of April 22, 1889.

"2. That one Martin C. Lawrence had a contest pending against said homestead entry, upon the ground that he, Lawrence, was a settler at the time and before Kate A. Woodruff made homestead entry thereon.

"3. That Kate A. Woodruff had a fence on the north side of said land and owned one-half of the fence on the east side of said land, the other half of the fence on the east line being owned by one Clay Peters. Kate A. Woodruff owned the fence on the south line of said land, and the one on the west side side thereof was built by the public for the purpose of obtaining a highway, which fence completely enclosed said quarter section of land.

"4. That Kate A. Woodruff had enclosed and in cultivation on the south side of said land, about twenty acres separate from the other parts of said land, upon which she had a small dwelling house and well.

"5. Said Lawrence had enclosed on the west side of said land about four or five acres, upon which he had a dwelling house, and within which enclosure he had a garden and well.

"6. That upon the 24th day of April, 1893, the plaintiff purchased the improvements of said Lawrence and peaceably entered into possession of the same, and Lawrence removed from said land. On the same day plaintiff entered on said land as a settler thereon under the homestead laws of the United States, for the purpose of making the same his home, and claiming it under the laws of the United States as a homestead.

"7. Upon the 28th day of April, 1893, this plaintiff peaceably and quietly entered into the possession of the said tract of land, except the twenty acres cultivated by Kate A. Woodruff and upon which she had located her dwelling house, and such entry was made without objection or protest on the part of said Kate A. Woodruff, and that ever since said date this plain-

tiff has held possession of all this tract of land, except the part so cultivated by Kate A. Woodruff.

"8.   On April 21, 1893, this plaintiff filed in the United States land office at Oklahoma City, an affidavit of contest, duly corroborated, charging that said Kate A. Woodruff and Otto C. Durland had entered within the Oklahoma lands after the 2nd day of March and before noon of April 22, 1889, in violation of law and were, therefore, not qualified to make homestead entry within the Oklahoma lands.

"9.   On the 29th day of April, 1893, Kate A. Woodruff filed in the United States land office at Oklohoma City a relinquishment of her homestead entry on said land and at the same time Otto C. Durland made homestead entry on said land, and at that instant of time, this plaintiff was a settler on said land under the homestead laws of the United States, and was claiming the same as his homestead, and had valuable improvements on said land, consisting of a dwelling house, fences and improvements of the value of $150 or more, and was in possession of all of said land and holding the same peaceably and quietly, except the twenty acres occupied by Kate A. Woodruff, and was claiming the whole of said land as his homestead.   That the plaintiff was at that time qualified in all respects to take public lands under the homestead laws of the United States.

"10.   Upon the 1st of May, 1893, this plaintiff filed in the United States land office, at Oklahoma City, an affidavit of contest against the said homestead entry of Otto C. Durland, duly corroborated, charging that the said Otto C. Durland, did, after March 2, and before noon of April 22, 1889, enter upon and occupy portions of the land described in and declared open to settlement by the President's proclamation of March 23, 1889, opening said lands to settlement, and further charging that said Otto C. Durland was within said lands before, and up to the hour of twelve o'clock noon of April 22, 1889, in violation of law, and further charging that the plaintiff was a homestead settler on the said land at and before the time that defendant made homestead entry thereon, and that such contest is now pending in the United States land office at Oklahoma City.   Said settlement was made and said

contest filed by this plaintiff in good faith, and for the purpose of acquiring title to said land.

"11.  Upon the 29th day of April. 1893, the defendant, Otto C. Durland, went into possession of the twenty acres of land, enclosed, cultivated and occupied by Kate A. Woodruff until that time.   On April 29 she surrendered to said Durland the possession of that part of the said land.

"12.  On the same day the defendant commenced invading the possession of this plaintiff, and drove his cattle onto that part of the claim held by the plaintiff, which cattle were by the plaintiff driven from said land, when defendant again, on Sunday, April 30, 1893, turned his cattle upon the possession of plaintiff, who again drove them out.   Defendant again drove them upon the possession of the plaintiff, and is continuing to keep said cattle there.   That defendant is now sharpening fence posts and getting wire upon that part of said claim formerly occupied by Kate A. Woodruff, and, as this plaintiff verily believes, and upon such belief alleges, is preparing to fence this plaintiff out of the possession of some part, or all of the land so held by him on said quarter section, and if not restrained will continue to force his cattle upon the possession of plaintiff and fence said land away from this plaintiff, and deprive him of the benefit thereof, and wrongfully appropriate such possession and benefits to the use of the defendant.

"13.  That plaintiff has no adequate remedy at law; that if the defendant be not at once restrained he will continue the repetition of his said wrongful acts and deprive this plaintiff of the use and benefit of his possession, and there is an emergency for the immediate issuing of a temporary restraining order, or plaintiff believes said defendant will attempt at night to erect a fence on plaintiff's possession, thereby excluding him from all use of said land;

"Wherefore, plaintiff prays that an immediate restraining order at once issue, restraining the defendant from in any manner interfering with or invading the possession of said plaintiff in and to all parts of said land, except the twenty acres formerly occupied by Kate A. Woodruff, until such time as a hearing can be had thereon, and at such hearing said restraining

order be continued, and on the final hearing thereof, that such restraining order be made a perpetual injunction, and that this plaintiff recover his costs."

The affidavit was duly verified and the restraining order heretofore mentioned issued thereon. At the time fixed for the further hearing Durland answered to the complaint as follows:

"1. That he denied that upon the 24th day of April, 1893, or at any other time the plaintiff settled upon the land in dispute in said action or entered upon the said land as a settler under the homestead laws of the United States, and he denies that on the 28th day of April, 1893, said plaintiff peaceably and quietly entered into the possession of the whole of said tract of land, except the twenty acres cultivated by Kate A. Woodruff.

"2. That defendant denies that the said plaintiff upon the 24th day of April, 1893, or at any other time, purchased the improvements of Martin C. Lawrence upon the land in dispute and peaceably entered into the possession of the same.

"3. That defendant denies that upon the 29th day of April, 1893, at the time when Kate A. Woodruff filed in the United States land office at Oklahoma City, O. T., a relinquishment of her entry on said land, that the plaintiff herein was a settler on said land under the homestead laws of the United States.

"4. Defendant denies that upon the 29th day of April, 1893, or at any other time he has invaded the possession of the plaintiff herein, in any part of said land.

"5. Defendant further shows the following facts concerning his right to and possession of the said tract of land as follows:

"That your affiant was on the 22nd day of April, A. D. 1889, and has ever since been, a duly qualified homestead entryman for said tract of land; that on the afternoon of April 22, 1889, he made a personal settlement upon said tract of land by going upon the same, setting up a stake and flag, cutting some poles and laying them together in a square form, and by camping on said tract that night; that on April 23, 1889, he surveyed out the lines of said tract and then

went to the United States land office at Guthrie, O. T., to make homestead entry of the same, leaving his baggage, tent and equipage upon said tract of land.

"That upon entering the land office at Guthrie, O. T., your affiant was informed that said tract of land was entered by Kate A Woodruff; that your affiant immediately began to take steps to protect his right to said tract of land, and filed a contest thereon on May 8, 1889, charging that he was the first legal settler on said tract of land, and that said Kate A. Woodruff was not qualified to enter said tract of land, for the reason that she had entered upon and occupied a portion of the lands declared open to settlement and entry by the President's proclamation of March 23, 1889, prior to twelve o'clock, noon, of April 22, 1889, and after March 2, 1889, contrary to the Act of Congress, approved March 2, 1889, relative to the Oklahoma lands, and in said contest your petitioner asked for a preference right to enter said tract under the second section of the Act of May 14, 1880; that a hearing was had on said affidavit of contest and decision duly rendered by the register and receiver of the United States land office at Oklahoma City, O. T., in favor of this defendant, and that said decision was duly affirmed by the honorable commissioner of the general land office, Washington, D. C., from which the said Kate A. Woodruff duly perfected an appeal to the honorable secretary of the interior department, Washington, D. C. That on November 2, 1892, defendant filed a suspended homestead application for said tract and deposited the fees and commissions in said entry; that on the 29th day of April, 1893, said Kate A. Woodruff filed a relinquishment of her homestead entry and a dismissal of her said appeal in the United States land office at Oklahoma City, and this defendant was at that time permitted, by virtue of his preference right, by reason of the cancellation of the said homestead entry of the said Kate A. Woodruff, under contest, and by reason of his suspended application aforesaid, filed November 2, 1892, to make homestead entry 6976, in said Oklahoma City land office, on the 29th day of April, 1893, for the land in dispute herein, said suspended application being on that day placed of record, for which entry he received receiver's dupli-

cate receipt 6076, a copy of which is hereto attached and made a part hereof; that on said day prior to the execution of the relinquishment of the said Kate A. Woodruff, and his homestead entry above mentioned, he purchased of the said Kate A. Woodruff all of her improvements now on said land, which consisted of a house, cultivated ground, well, fencing and all other improvements claimed by her; that on said day and for a long time prior thereto, the said Kate A. Woodruff had the exclusive, peaceable and lawful possession of all of said tract of land save and except certain improvements claimed by one Martin C. Lawrence, situated about midway north and south on the west side of said land, and containing some five or six acres, and enclosed by a wire fence, and the said Kate A. Woodruff had all of said tract save and except the tract above described, the possession of which was claimed by the said Martin C. Lawrence, enclosed by a good and sufficient wire fence, and used the same as a pasture, since the summer of 1889; that on the 29th day of April, 1893, this defendant made personal settlement upon said tract of land, going upon the same in person, taking possession of said house, moving a portion of his furniture therein and establishing his residence thereon; that he immediately turned his cattle into the enclosure above mentioned, surrounded by fence, bought of the said Kate A. Woodruff; that he immediately started his team to plowing upon the cultivated land thereon, and assumed the control and possession of the whole of said premises except .the five or six acres heretofore mentioned, contained in the enclosure of Martin C. Lawrence, said settlement being prior to his said homestead entry of this defendant.

"6. That on the 10th day of December, 1892, the above mentioned Kate A. Woodruff leased to said J. W. Sproat and S. G. Sproat, the sons of the plaintiff herein, said tract of land and all improvements thereon and including the pasture heretofore mentioned, from the possession of which the plaintiff seeks to exclude the defendant. all of which more fully appears by the articles of agreement between said parties hereto attached, marked 'Exhibit B,' and made a part of this answer; that soon after said

lease was made, the said lessees went into possession of said premises, placed in said pasture a number of milch cows, and other stock, and placed in charge thereof, as their agent, Samuel Sproat, the plaintiff in this action, who has remained in charge of said stock, and as the agent of said lessees, in the possession of said premises ever since said time, and still so remains in possession of said premises, by force, as the agent of said lessees, notwithstanding said lease was cancelled and all rights surrendered thereunder by the said S. G. Sproat and J. W. Sproat, in consideration of the payment to them of the sum of one hundred dollars ($100.00) on the 28th day of April, 1893, as will more fully appear by the written release executed by the said S. G. Sproat and J. W. Sproat, endorsed upon the articles of lease hereto attached, marked 'Exhibit B' and made a part of this answer.

"7. That the plaintiff, on the 29th day of April, 1893, entered the enclosure of the defendant, heretofore mentioned as composing this defendant's pasture on said tract, and drove his cattle therefrom into the highway; that again on the 30th day of April, 1893, the plaintiff again drove said cattle of the defendant from said pasture, although requested by the defendant to desist from such unlawful acts, and that he threatened to wholly exclude the cattle of the defendant from said pasture, and if necessary to use force to that end.

"8. That the said Samuel Sproat, plaintiff, has turned certain cattle and horses into the enclosed pasture of this defendant on said tract of land, and now occupies and uses said pasture, and threatens to occupy and use the same to the exclusion of this defendant and to his great damage; that said plaintiff interferes with the peaceable use and possession of this defendant of said tract of land, enclosed in said pasture fence, by forcibly turning therefrom defendant's stock, and threatens to continue said acts of trespass, and that the said plaintiff is wholly insolvent, and that your defendant has no adequate remedy at law, and that an injunctional order against said plaintiff will avoid a multiplicity of law-suits, and prevent a great and irreparable injury to this defendant.

" Wherefore, the defendant asks that the prayer of the plaintiff herein be denied, that the temporary restraining order granted May 1, 1893, be dissolved; that an injunction may issue directed against said Samuel Sprout, his agents, employees and servants, and all persons acting through, under or with him, restraining him and each of them, from pasturing horses, cattle or other stock of any kind, upon said tract of land within the enclosure of this plaintiff herein set forth, from trespassing upon, using or occupying in any manner any part of said enclosure or from interfering in any manner with the possession of the defendant in and to any part of said tract of land, or the improvements thereon, located and purchased as heretofore set forth, from the said Kate A. Woodruff, and from driving out, removing or interfering with cattle, horses, or other stock of the defendant, kept in the enclosure of said defendant on said premises; from fencing, breaking up, plowing, planting or in any manner using any of the land on said tract of land in dispute, covered, occupied by, or surrounded by the improvements of this defendant, and comprising all of said claim, except said tract of five or six acres herein mentioned as the improvements of Martin C. Lawrence, together with the costs of this action, and such other relief as equity may require."

Attached to the answer of defendant appears a copy of receiver's duplicate receipt No. 6976 issued from the Oklahoma City land office showing that Otto C. Durland entered the land as a homestead April 29, 1893; also appears an exhibit setting forth a lease, executed by Kate A. Woodruff to Joseph W. Sproat and S. Grimes Sproat, bearing date December 16, 1892, and leasing all the land except that portion occupied by Martin C. Lawrence.

The lease is for the term of one year, beginning on March 1, 1893. The instrument has the usual covenants found in leases, and, in addition thereto, a provision that the lessor reserved the right to use and occupy the house standing on that portion of the land

3

leased. That the lessees should in no manner allow any persons, other than themselves, to establish a residence upon the land, nor to enter into possession of any portion of the land, nor sub-let to any person, nor deliver them any portion of said tract, and a violation of such covenants or entering into collusion with any person for such purpose, should render void the lease; also a further covenant appears to the effect that the lease was in no way to be used for the purpose of affecting the homestead right of Kate A. Woodruff. On the back of the instrument there appears the following endorsements:

"OKLAHOMA CITY, O. T., April 25, 1893.

"For and in consideration of the sum of $100.00 we hereby cancel this lease and waive all settlement claims of any nature whatsoever under the same to the tract herein described and hereby deliver possession of said tract to first party, Kate A. Howe.

(Signed)                                 "S. G. SPROAT,
                                          "J. W. SPROAT."

The reply of Sproat to the answer raises no new issues in the cause. Numerous affidavits are filed in support of the petition and answer and from the records as thus presented we find the following to be the facts in the case.

1.  April 22, 1889, Otto C. Durland, Kate A. Woodruff and Martin C. Lawrence settled upon and claimed as a homestead the northwest quarter of section 34, township 12 north, range 3 west, situated in Oklahoma county.

2.  Kate A. Woodruff filed her homestead entry for said tract of land at a time not definitely shown in the record, but prior to May 1, 1889.

3.  On May 8, 1889, Otto C. Durland instituted contest proceedings against the entry of Woodruff upon two grounds. (1) That said Woodruff was disqualified from entering as a homestead land in Oklahoma for the reason that she entered upon a portion of the lands in Oklahoma prior to noon of April 22, 1889, and

subsequent to March 2, same year, and (2) that he, Durland, was the first legal settler upon such tract; he prosecuted his contest to effect and a decision was rendered in his favor both at the local land office and by the commissioner of the general land office at Washington, D. C., and at the time of her relinquishment of her homestead entry, April 29, 1893, her appeal was pending before the secretary of the interior. Immediately upon the filing of her relinquishment as aforesaid, Durland filed his homestead entry for the land; it appears that Durland did not follow up his settlement upon the land made April 22, 1889, and at the time of his homestead entry had only such an interest in the land as grew out of his contest alleging that Woodruff was disqualified from entering the land as a homestead.

4, Martin C. Lawrence instituted a contest against the entry of Woodruff and claimed prior settlement to that of Woodruff. The record does not disclose the nature and extent of the settlement, except that it appears that he was using a small tract of land, in extent about five acres, situated in the western portion of the tract, and separated from the main body of the same by a fence, which tract was so used until April 24, 1893.

5. That Samuel Sproat, appellant and plaintiff below, is the father of the two persons who executed the written leases from Woodruff heretofore mentioned; that said Sproat was upon and about the premises leased assisting and working for his sons from December 16, 1892, until the sons surrendered and cancelled the lease on April 25, 1893. On April 21, 1893, Sproat filed in the land office at Oklahoma City an affidavit of contest against the entry of Woodruff and Durland, alleging that both Woodruff and Durland were disqualified from entering the land as a homestead; that on the 24th day of April, 1893, Sproat purchased from Lawrence his improvements upon the land and on the same day went into possession of such improvements. On May 1, 1893, Sproat filed in the land office a contest against Durland for the land, and, as grounds of such contest, alleged that Durland was disqualified from entering the same by reason of having entered upon lands in Oklahoma

subsequent to March 2, and prior to April 22, 1889, and further, that he, Sproat, was an actual settler upon said land prior to and at the same time Durland filed his homestead entry; that on April 28, 1893, Sproat began occupying all that portion of land except the tract heretofore mentioned as the twenty acres used for cultivation by Woodruff.

6. Immediately after the filing by Durland of his homestead entry, to-wit: April 29, 1893, Durland entered into possession of the house formerly occupied by Woodruff and began using all of the tract, except that formerly occupied by Lawrence, for pasturage and otherwise; Sproat claimed the right to the possession of all the tract, except the twenty acres referred to. Sproat drove Durland's stock off from the premises and Durland insisted upon his right to hold the same upon the land and to the control of all the tract except that formerly used by Lawrence.

7. Upon the hearing, the judge dissolved the temporary restraining order, previously made, and granted an order restraining Sproat from the use or occupancy of any of the land, except that portion previously used and occupied by Lawrence, and awarded possession of the same to Durland; the order so made to remain in operation until the final determination of the litigation between the parties concerning the title to the land, unless otherwise ordered by the court. It appears from the record that an attachment for the contempt of the foregoing order was issued against Sproat and that he was brought before the judge below to answer to such charge; that he was not punished for disobeying the order, because of his promise of obedience to the same.

The plaintiff below, Sproat, excepted to the order of the court and brings the case here for review.

### ASSIGNMENT OF ERRORS.

While numerous errors are assigned, those which bear upon the questions involved may be stated as follows:

1. Error in dissolving the temporary restraining order made on appellant's complaint, and refusing on the hearing of said cause to continue said order.

2.   In granting appellee an injunction and restraining order on his answer and cross-complaint on the pleadings and evidence in the case.

3.   In giving to the injunction and restraining order the force and effect of a writ of possession.

4.   In giving judgment against appellant for costs and in compelling appellant to remove his stock from the pasture described in his said complaint.

### OPINION OF THE COURT.

To fairly consider the first error assigned, it becomes essential to determine what possessory rights each party has in the land, by virtue of their settlement, contest and the homestead entry of Durland.

A conclusion upon these questions can only be reached by an examination of the Acts of Congress relating to contests and entries under the homestead laws of the United States and the decisions of the secretary of the interior in construing such laws.

We think that such laws and decisons must govern the status of the parties while the title to the lands remain in the government, because congress, having the full power to dispose of the public domain, has, by appropriate legislation, vested in the interior department all powers necessary to convey public lands until the title thereto passes from the government by patent   Under the head of Homesteads, (p. 419, Revised Statutes of the United States, beginning at § 2289) will be found the law under which the title to the land in dispute must be obtained from the government, and it will appear that such law provides for filing an entry, and that such entry gives by plain implication of law a right of residence upon and occupation of the tract so entered.  (See § 2291 supra). In fact, unless residence upon and cultivation be made of the land within six months from date of filing, the entryman cannot acquire title to the same. This law evidently intended to, and did, give to the

entryman the exclusive right to the use of the land entered, and from the date of its adoption until Congress passed the Act of May 14, 1880, which will be further noticed hereafter, the only way by which a person could secure an interest in a tract of land, under the homestead law, was by filing his homestead entry therefor.

And the first person, in point of time, making homestead filing, had the right to the exclusive use of such land.   The act of May 14, 1880, was passed for two purposes: (1) to secure to a successful contestant a reward for his services in aiding the government to expose fraud, by permitting him to enter the land if he prevailed in his contest, and, (2) to permit an inceptive right to be obtained, under the homestead law, other than by filing an entry for the land.   This latter act was not intended to change the law relating to the use or occupancy of the land, except that an actual settler upon the land now has three months from the date of his settlement within which to file his homestead entry for such land, and his rights relate back to the date of his settlement upon land, and it follows that where a person has made an actual settlement upon land, and if, within three months therefrom, another files an entry thereon, the settler having the prior right may institute his contest within the time allowed to file his entry, and pending such contest occupy the land, but in such case he would not be permitted to occupy the whole of the tract, because the entryman would have equally as great an interest in the tract until the land department finally awards the land to the party entitled to the same.   It will therefore be seen, by an examination of the statutes referred to, that a person claiming a legal settlement upon homestead land, and a right to occupancy, must base his claim upon either a filing for the same or upon a settlement made within three months prior to such filing.

This view of the law is, we think, fully sustained by the decisions of the interior department, such decisions uniformly holding that a homestead entry segregates the land from settlement and that a person going upon the same, while a valid entry remains of record, is a mere trespasser.

See the opinion of Attorney-General McVeigh, found in the 1 L. D. 30; *Oliver vs. Thomas, et al.*, 5 L. D. .286; *Gudmanson vs. Morgan*, 5 L. D. 147, and the cases cited in those decisions, and *Sturr vs. Beck*, 133 U. S. 548.

It is suggested that *Commager vs. Dicks*, 1 Ok. 82, seems to establish a different rule. But an examination of that decision shows that each of the parties to that controversy were *bona fide* settlers upon the land, and that such settlements were made in accordance with the laws of congress above referred to.

Such being the law let us examine the facts relative to Sproat's alleged settlement, and determine whether or not Sproat became a settler upon the land in any manner known to the law : Kate A. Woodruff having filed her entry in April, 1889, and not relinquishing the same until April 29, 1893, any act of settlement made by Sproat, prior to her relinquishment, was the act of a mere trespasser and gave him no rights whatever. His purchase of the improvements of Lawrence, on April 24, 1893, could give him no settlement rights, because a settlement right cannot be transferred. It is a personal act and not the subject of sale.

*Fox vs. The Southern Pacific Railroad Co.*, and cases there cited, 2 L. D. 558.

*Pruitt vs. Chadburne*, 3 L. D. 100.

*Willis vs. Parker*, 8 L. D. 623.

*M. K. & T. Ry. Co. vs. Beal*, 10 L. D. 504.

Neither did the contest filed April 21, 1893, against both Woodruff and Durland initiate a settlement right

to the land.   As we have heretofore pointed out, such right must be based upon either a filing or settlement made within three months prior to an adverse filing. But it is contended that, because Sproat was actually upon the land as a settler, at the time Woodruff filed her relinquishment, that his right attached between the time of such relinquishment and the filing by Durland.   This would be true if it were not for the fact that Durland was a contestant for the land and entitled, by virtue thereof, to a preference right of entry. Many cases may be found decided by the interior department wherein it is held that the rights of a settler upon government land attach at the instant the entry upon the land is cancelled, and as between parties upon land covered by an entry, it may be said, that the first settler in point of time will be permitted to enter such land.   This doctrine, however, is predicated upon an entirely different state of facts than those presented in this case.

In *Greer vs. Farrington,* 4 L. D., 410, the following language is used :

"Conceding that while an entry stands uncancelled upon the record, settlers upon the land covered thereby acquire no rights as against the record entryman or the United States; yet as between such settlers, priority of settlement may be properly considered."

This rule has been adhered to in subsequent cases, but in the case referred to neither party was a contestant for a preference right of entry, and in discussing the question the honorable secretary states that neither party had so secured any right as a preference contestant, and, after a careful review of all the decisions of the interior department, we are of the opinion that nowhere will the doctrine be affirmed that a settlement made, and covered by an existing entry, confers any right whatever, where such entry is cancelled as a result of a contest for a preference

right.   If this were not true, the very purpose for which the law was passed, which gives to a successful contestant a preferred right of entry, would be defeated.   The law intends that persons who go the trouble, and in many cases the vast expense of successfully contesting an entry, shall enjoy the fruits of their victory.   All the decisions of the department are in harmony with this view.

> *Haskins vs. Nichols*, 1 L. D. 145.
> *Nichold vs. Littler*, 3 L. D. 224.
> *Ebbott vs. Schartzel, et al*, 4 L. D. 587.
> *Hemsworth vs. Holland*, 8 L. D. 400.
> *Paulson vs. Richardson*, 8 L. D. 579.

It will be observed from an examination of the fact in this case that Durland filed his contest against the entry of Woodruff on May 8, 1889; that he not only claimed in such contest to be the first legal settler in point of time, but alleged that Woodruff was disqualified from making such entry, and while it may be true that he lost whatever of settlement right he had, because he failed to follow up such settlement, yet, as shown by the record, he did follow up his contest for a preferred right, and procured a favorable decision in both the local office and before the honorable commissioner of the general land office.   It is true that the case was still undetermined, by reason of an appeal from the general land office to the honorable secretary of the interior, but that is immaterial.   The relinquishment by Woodruff, pending such an appeal, must be presumed to have been the result of the contest.

> *McCall vs. Molnar*, 2 L. D. 265.
> *Glaze vs. Bogardus*, 2 L. D. 311.
> *Hay vs. Yager, et al*, 10 L. D. 105.   .

While it is true that the presumption that the relinquishment was filed as a result of the contest may be overcome by proof, in some instances, yet, the party

upon which such burden rests has no greater or higher interest in the land than a contestant for a preferred right.

From the foregoing it is plain that Sproat obtained no rights whatever as a settler upon the land, either by his contest on April 21, 1893, his purchase of the improvements of Lawrence on April 24, his alleged settlement on April 28 at a time the entry of Woodruff remained intact, nor could his settlement at the time such entry was cancelled avail him anything, because of the preferred right of Durland, by virtue of his prior contest. Sproat's subsequent contest against Durland, of May 1, can only be considered as having been commenced for a preference right, which will give him the occupany of the land only upon its successful termination.

This view of the law is, we think, fully supported by the acts of congress, and the decisions of the the interior department, and is manifestly equitable to all persons seeking to acquire lands under the provision of the homestead law. Such being true, it must follow that the court below committed no error in dissolving the temporary restraing order, by him personally granted, because Sproat had, under the law, no right to the occupancy of the land and the restraining order was therefore improperly granted, and upon issue joined should have been dissolved.

The second allegation of error is not tenable. A court may undoubtedly make such an order in an injunction proceedings. We will do equity between the parties to the action. The appellant had brought the appellee into court. The answer and cross-complaint of defendant were as fully before the court as if the proceedings had been originally commenced by the appellee.

High on Injunctions, chap. 1, sec. 32.

In the third assignment of error it is also urged that

the court erred in giving to the injunction and restraining order the force and effect of a writ of possession.   The order of the court did operate to give Durland the use of land then in possession of Sproat, and to that extent had the same effect as a writ of possession.   But, if the order was properly granted, the fact that it operated in the manner claimed would be immaterial.   As a general rule it may be said that injunction is a preventive remedy and will only be used to prevent future injury, rather than to afford redress for wrongs already committed, and is, therefore, to be regarded more as a preventive than a remedial remedy.   But while the jurisdiction of a court of equity by way of mandatory injunction is rarely exercised, it is, nevertheless, too well established to admit of a doubt.

High on Injunctions, §§ 2 and 478.
*Corning vs. Troy Factory*, 40 N. Y. 191.
*Webb vs. Portland Man. Co.*, 3rd S. C. 190.
*Webster vs. Coake*, 23 Kans. 637.
Pom, Eq., Jur. Vol. 3, § 1359.
*Cooke vs. Boynton*, 135 Pa. 110.
*Black Lick Co. vs. Saltsburg Gas Co.*, 139 Pa. 448.

And we entirely approve of the principle laid down in *Tucker vs. Carpenter*, Hemp. 441, found in a note to § 41, of chapter 1.

High on Injunctions, where the court says :

"A writ of injunction may be said to be a process capable of more modification than any other in law ; it is so malleable that it may be moulded to suit the various circumstances and occasions presented to a court of equity.   It is an instrument in its hands capable of various applications, for the purpose of dispensing complete justice between the parties.   It may be special, preliminary, temporary, or perpetual ; and it may be dissolved, reviewed, continued, extended or contracted.   In short it is adapted and used by courts of equity as a process for preventing wrong between and preserving the rights of the parties before them."

It will be found upon examination that the English authorities are almost uniform in supporting the doctrine of mandatory injunctions, and that where an application for such injunction is denied. such refusal is based upon the fact that an adequate remedy may be found in the law; and while in this country the courts, generally speaking, refuse mandatory injunctions, yet where it clearly appears that no relief can be had under the law, we know of no reason, sound in principle, which will justify a court in withholding its aid by mandatory injunction, in favor of a person who seeks protection from a trespasser. or to be restored to possession of property which is withheld from him wrongfully.

In the case of consideration, the question of the jurisdiction of the court to grant restraining orders, pending the litigation in the land department, is not raised; in fact, it may be stated as a well settled proposition that the courts have the right to deal with the question of possession as between settlers on the public domain, until such time as the government, by its issuance of a patent. puts forever at rest the title to the lands. It is the duty of the courts. in dealing with such matters, to exercise their equitable powers, and see to it that possession is given to the person who, under the laws of congress, is entitled thereto; and when it is ascertained that a person claiming the right to the use and occupancy of a tract of land, the title of which is still in the United States, is, under the laws of congress, a mere trespasser, it becomes the plain duty of the courts having jurisdiction to give the proper party the possession of the land upon which the trespass is committed.

A mere assertion of right is insufficient to deprive the rightful occupant of the quiet use of the land, and, as between settlers upon the public domain, the courts should inquire into the status of the lands far enough

to determine whether or not a person asserting a claim of possession has a color of right to such possession under the homestead law, and if it be found that he is a mere trespasser, or that the law will not, under any fair construction, warrant his claim, it is the clear duty of the courts to issue a mandatory order of injunction, restraining him from the further unlawful occupancy. This question is one of vital importance in Oklahoma.

All our lands are entered, and title procured therefor. under the homestead laws of the United States. The questions arising out of adverse possession, as between homestead claimants, daily confront our courts. To say that no relief can be granted, or that our courts are powerless to do justice between litigants in this class of cases, pending the settlement of title in the land department, would be the announcement of a doctrine abhorrent to a sense of common justice. It would encourage the strong to override the weak; would place a premium upon greed and the use of force, and in many instances lead to bloodshed and crime. Such a state of affairs is to be avoided and the courts should not hesitate to invoke the powers inherent in them and lend their aid. in every way possible, in aid of justice by preventing encroachments upon the possessory rights of settlers, or by equitably adjusting their differences.

All Justices concurring, except

BIERER, J., dissenting: My dissent in this case is entered, not to the action of this court in affirming the judgment of the court below, but to the reasons assigned for the affirmance of the judgment.

From the facts found by this court, applying the uniform doctrine of the courts in holding that the courts have jurisdiction to restrain one contestant for the right to enter a tract of government land from forcible intrusion upon the actual possessions of

another claimant to such tract, the decision of the courts below should be affirmed, the findings of fact of the court showing that both Sproat and Durland were opposing claimants for the prior right to enter this tract of land, the title to which is' in the government of the United States, contained, among other things, the following:

"That he, Sproat, was an actual settler upon said land prior to, and at the time, Durland filed his homestead entry; that on April 28, 1893, Sproat began occupying all of that portion of the land, except the tract heretofore mentioned as the twenty acres used for cultivation by Woodruff.

"6.    Immediately after filing by Durland of his homestead entry, to-wit.: April 29, 1893, Durland entered into possession of the house, formerly occupied by Woodruff, and began using all of the tract, except that formerly occupied by Lawrence, for pasturage and otherwise.    Sproat claimed the right to the possession of all the tract, except the twenty acres referred to.    Sproat drove Durland's stock off from the premises, and Durland insisted upon his right to hold the same upon the land, and to the control of all the tract, except that formerly used by Lawrence."

These findings, together with the other findings, to the effect that Durland had purchased the improvements from Kate A. Woodruff, including her fence, which constituted the enclosure in controversy, amount to a finding that Durland had the prior possession of the enclosure and that Sproat was seeking by force to enter thereupon; and this being true the court below adjudged rightly in enjoining him from the commission of such a trespass.    The strongest claim that could be made by Sproat, upon such findings, would be that Durland had ousted him, Sproat, from a prior possession, he, Durland, actually having possession at the time of the action, by having his stock thereon; and, if Sproat had had the prior possession and Durland had actually dispossessed him,

then Sproat's remedy was by an action of forcible entry and detainer, and not by an action of injunction, and the court ruled properly in dissolving Sproat's injunction. It is to the reasoning of the court in holding that Sproat could be enjoined, not because of Durland's prior possession, but because of Durland's right by virtue of his homestead entry, that I dissent.

The decision of the court is as sweeping in its character and results as it is barren of any cause or necessity therefor, and I want to enter my earnest protest against the action of the court in voluntarily assuming jurisdiction of matters which involves the contesting claim of parties litigant before the land office prior to the time that the parties have exhausted all of their rights before the land department, the department specially designated by congress to hear and determine these contesting claims; and to the action of the court in reasoning itself into such jurisdiction by an analysis of the homestead right, contrary to the uniform and unanimous holdings of all the courts of last resort, including those of the United States supreme court and of the states and territories of this country.

The decision is sweeping in its results, because it tears away the barrier which the courts have uniformly maintained against land litigants, to their entrance of its forum until after the title, at least the equitable title, had passed from the government. It is barren of necessity, therefore, because the case could rightfully have been decided upon the question properly before the court, as to whether Sproat or Durland was interfering with the actual possessions of the other.

It gives jurisdiction to the court by an analysis of the land laws, a thing which this court has heretofore positively refused to do.

In *Commager vs. Dicks*, 1 Okla. 82, the court says:

"It is not necessary to enter into an analysis of the land laws; the question of jurisdiction over such matters was thoroughly discussed in the case of *Adams vs. Couch*, 26 Pac. Rep. p. 1009, and the effects of a receiver's receipt, such as the plaintiff holds."

It is only by an analysis of the homestead right that the court in this case is able to come to the conclusion that it has upon the ground upon which it is based; and I consider this an overruling of this court without any necessity being shown for such action; and, in my judgment, decisions of supreme courts should not be overruled except in cases which necessarily require an overturning of prior holdings. It is the taking of jurisdiction of matters involved in the litigation of contesting claimants before the land office and which do not involve the intrusion by one party upon the actual possessions of another that I am opposed to. This question has twice already been squarely before the Supreme Court of this territory. (1) *Adams vs. Couch*, 1 Oklahoma, p. 17, the third decision rendered by the supreme court of the territory; (2) *Commager vs. Dicks*, 1 Oklahoma, p. 82, also decided at an early day. It is true that the case of *Adams vs. Couch* only involved the question as to whether Adams, by virtue of his homestead entry, had the right to dispossess the other contending claimants by action of ejectment, but I consider that the form of action was immaterial, for it was squarely held that the right did not pertain to Adams by virtue of his homestead entry receipt to dispossess the other parties, and the case did not turn upon the form of remedy sought, and, if the right did not exist, as it was held in that case it did not, certainly the form of remedy would be immaterial, for courts of equity were never instituted for the purpose of creating rights, but were instituted for the purpose of enforcing them by rem-

edies which the courts of law, by reason of their rigid adherence to established forms, were unable to afford. It was never held that a court of equity could create a right, but only that it could enforce one; and, if there was an absence of right, a court of equity has always been held as powerless to grant relief as a court of law itself. But the question of jurisdiction, while not the principal one involved, was the principal one passed upon in *Adams vs. Couch*, and I think the court rightly considered it at that time because of the urgent request of most able counsel, based upon the great public necessity for having this question settled in the early jurisprudence of this territory. The court, in giving its reasons for passing on this question, said:

"While we regard it ordinarily as the better course to pass only upon such questions as are decisive of the case, we feel that for the public good, and for the purpose of checking (so far as it is within the scope of our power and duty) unnecessary and expensive litigation, we should at least give our views on the question of jurisdiction, raised by the pleadings, the decision of which will dispose of the other questions preceding it."

And after summing up the leading cases of the courts of the states and of the supreme court of the United States, the court said:

"Here is a strong array of federal decisions announcing the doctrine as to when the court will exercise jurisdiction over the decisions of the land department; the time when it will be, and the time when it will not be exercised. The courts have uniformly held that they will not exercise such jurisdiction while the matter is *in fieri*, and prior to, the time when the United States has parted with the title.

"To declare the plaintiff out of court in this case is to give effect to the doctrine here laid down."

That is to say, the plaintiff was declared out of court, not entirely because of the failure of the home-

stead entry to vest him with the right which he claimed, to dispossess others also claiming the same land, but because of the fact that the courts were without jurisdiction in such matters.

In *Commager vs. Dicks*, Commager claimed the right to dispossess Dicks from a part of the land held by him because of the existence of Commager's homestead entry on the quarter section. The learned chief justice who rendered the opinion in the court below, giving to the homestead entry a similar inherent power as that which is given by the court in this case, sustained the action of Commager and entered a judgment dispossessing Dicks. On appeal to this court, the learned chief justice joined with his associates in overruling the judgment of the court below, not after an analysis of the homestead right, because that was squarely refused, but upon the ground that the court had no jurisdiction of the action.

These decisions of the supreme court of this territory, already rendered, are in harmony and accord with the decisions of the other courts, on which they are based, and the case, in my judgment, is not changed now, because of the fact that the question determined goes no farther, and can go no farther, than the matter of possession of the tract of land, and because the decision of this case cannot be held to bind the officers of the land department in any of its branches. While a decision here cannot bind the parties there, it cannot but help to encourage the one and deter the other, a thing which congress never contemplated in giving jurisdiction to the courts of this territory. The very fact that such decision cannot bind the litigants before the land office, also shows how fruitless will be all of the expensive litigation carried on in the courts, under the doctrine laid down by the court in this case, by contending claimants; how fruitless will be the judgments rendered, at

the behest, probably, of the party who has the money to carry on this useless litigation against his brother, who can illy afford, or, possibly, not bear the expense thereof. But I do not consider that the right to possession of a tract of government land is a question so independent of his right to enter as that it may be determined by the courts, in advance of the decision of the land department in the case, in such a manner as that the court shall say that the one claimant shall possess all and the other none. The policy of the land laws for the last half century has been to induce and require, on the part of a claimant, the actual occupancy and improvement of the land to which title is sought. The pre-emption law required residence, improvement, and payment for the land. The homestead law required residence and improvement, without payment. It was a later law than the pre-emption law, giving the land to him who sought it, without money and without price, in order to get him to actually cultivate and improve the land. The timber culture law, passed later, provided the cultivation and growing of trees as the only conditions precedent to the actual procurement of title. And in all these acts, of course, proof of the performance of these conditions was required, but the tenor and effect of these laws show that what the government sought in giving this bounty was that the grantee should actually occupy and improve; and it was never intended, in granting the right of homestead entry, that the right was given to the entryman to refrain from occupying the land himself, and, at the same time, keep from the possession of such land, another who sought in any form to enter it, nor to dispossess another claimant, already in possession of a part of the land, which he, the homestead entryman, might also desire to occupy. The inherent right to occupy did not give a legal or equitable right to dispossess, and such right to dis-

possess was not acquired by the conditional equity vested in the homestead entryman prior to his complete compliance with all the requirements of the law. I fiud no authority holding that the homestead entry grants any such right. The homestead law has been in force for more than thirty years; all of the rights inherent and pertaining to it, with reference to the occupancy of land and the right to the exclusive possession, if at all, are the same now as they were on May 20, 1862, when the law was passed, but no court of last resort, so far as I can find, and I am cited to none in the learned decision to which I dissent, has ever held that there was inherent in the homestead entry any such right, and the reasoning of the decisions which have approached the question are all the other way.

In *Marquez vs. Frisbie*, 101 U. S. 473, the court says:

"After the United States has parted with its title, and the individual has become vested with it, the equities subject to which he holds it may be enforced, but not before. *Johnson vs. Towsley*, 13 Wall. 72; *Shepley vs. Cowan*, 91 U. S. 330."

Again the court says :

"We have repeatedly held that the courts will not interfere with the officers of the government while in the discharge of their duties in disposing of the public lands, either by injunction or mandamus. *Litchfield vs. Register and Receiver*, 9 Wall. 552; *Johnson vs. Twamley*, 7 id. 347; *The Secretary vs. McGarrahan*, 9 id. 298."

"And we think it would be quite as objectionable to permit a state court, while such a question was under the consideration and within the control of the executive departments, to take jurisdiction of the case by reason of their control of the parties concerned, and render decree in advance of the action of the government, which would render its patents a nullity when issued."

It seems to me it would be quite as objectionable

for the territorial court to take jurisdiction of the parties litigant and render a judgment which would affect the rights of the parties concerning the particular thing which congress sought to induce the intending entrymen to do, to improve, occupy and cultivate the land, based upon the conclusion of the existence of a valid entry, which is sworn to be tainted with an infirmity which renders it void from the beginning.

The act approved March 2, 1889, by which these lands were opened to settlement, contained the following language :

"But until said lands are opened for settlement by proclamation of the president, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall be permitted to enter any of said lands, or acquire any right thereto."

Now the record shows that Sproat filed his affidavit, duly corroborated, to the effect that Durland had entered upon and occupied the Oklahoma lands in violation of this section of the act of congress. If that is true, what rights can Durland get ? The act says that he shall not acquire any right thereto. Can the court say, in advance of the action of the land department, that he shall acquire a right by virtue of an entry which is void from the beginning, unless Sproat and his witnesses committed perjury; which certainly we cannot assume.

The right to dispossess, if it exists at all, which I do not believe is true, exists by virtue of the homestead entry, and if that entry is void, then no right can exist. If a fraud has been perpetrated upon the government by Durland, then the government has granted him no right, but this can only be determined by the land department, and the courts cannot, in advance of such action, issue an order which will determine such right.

This question of jurisdiction was squarely before

the court in the case of *Empey vs. Plugert*, 64 Wis. 603, cited by the supreme court of this territory in *Adams vs. Couch*, wherein it was claimed that the right existed in the homestead entryman who had had the homestead entry of record on the tract, but which had been cancelled, as he alleged, through the fraud and perjury of the defendant, and who had also resided upon the land and furnished his proof of compliance with the law so as to entitle him, as he believed, to the final certificate therefor, but whose proof had been rejected by the secretary of the interior, and his right to the certificate denied, because of the fraud and perjury of the defendant, to dispossess the defendant who then had the homestead entry upon the land.   In this case the supreme court defined the right given to a party by virtue of an existing homestead entry and said :

"If the courts of this state have jurisdiction in such a case, it is not perceived what effectual remedy could be administered.   There has been an adjudication of the land office department against the claim of the plaintiff ; and the defendant has settled on the land as a homestead claimant, and obtained the first certificate as such.   That certificate gives the defendant no right to the land, and he must thereafter perform all of the conditions of the homestead law before he will be entitled to a certificate upon which the patent can be issued."

If the certificate of entry gives the defendant no right to the land, how can it be said that there is inherent in it the right to dispossess another who by the procedure provided by the land department is contesting for the prior right to enter the land and procure the title thereto from the government?   How can it be said, if there is no right, that a court of equity has jurisdiction to enforce a right?   Can a court of equity enforce a right which does not exist in law or equity?   If so, then the jurists of this coun-

try and of England have been very derelict in failing to discover this principle. Further along the court says:

"The defendant has made and filed such affidavit, and paid the initiation fee, and entered upon the settlement of the land. He is yet to secure a homestead therein by residence and cultivation. He has yet secured no right to the land, but a mere privilege or permission to enter upon it for the purpose of obtaining title to it by the performance of such conditions. He may never secure or be entitled to the land. The title still remains in the government and may so remain."

This decision is squarely in point upon the question of the right inherent in a homestead entry, and I am certainly unwilling to join in overruling this construction of the homestead law of the United States, made by the decision of one of the foremost supreme courts of the states of this country and concurred in and followed by the supreme court of this territory, especially when it is done in a case which can more properly be decided upon a principle which has for years been unquestioned by the courts.

The supreme court of Dakota, in the case of *Forbes vs. Driscoll*, 31 N.-W., 633, and which is also cited and approved by the supreme court of this territory in *Adams vs. Couch*, which is cited and approved in *Commager vs. Dicks*, went even beyond the question as to whether or not any contest was pending, and held that the court had not jurisdiction of a controversy concerning the possession of land between contesting pre-emption claimants, which did not involve an intrusion by one upon the actual possessions of the other, irrespective of the question as to whether or not it is proven that such contest existed. The court there said:

"Here the defendant alleged and offered to prove that a contest was then pending before the local land

office between the plaintiff, Forbes, and the defendant, Driscoll, for the same land, which offer was rejected as immaterial. Perhaps, as a mere matter of fact, it was immaterial; for the mere fact as to whether a contest was or was not pending was immaterial, the jurisdiction of the court depending not upon the fact of whether a contest was or was not pending, but upon the fact of whether the jurisdiction of the department was or was not ended by the issue of the patent. Here the jurisdiction of the land department had been exercised no further than to permit the filing of the declaratory statement by each contesting claimant. The matter was yet *in fieri*, and the decision of the court upon the issue framed by the pleadings, determining in advance of the department the pre-emption right in favor of Forbes, was an unwarranted interference with the jurisdiction of the land department, and was unauthorized, within the doctrine announced by this decision."

This case of *Forbes vs. Driscoll* is most comprehensive in its scope and has almost universally been considered as determining against the jurisdiction of the court to interfere with the contesting claimants for public land, except in cases where one intruded upon the actual possessions of another. It matters not that this was a pre-emption case, if the right did not inhere in the homestead entryman to have and hold the exclusive possession of the tract covered by the entry.

This question was determined adversely to the existence of such right in *Adams vs Couch* and in *Empey vs. Plugert*.

In the case of *Schoolfield vs. Houle*, 22 Pac. Rep. 781, the supreme court of Colorado held substantially to the same effect, and says:

"Under the homestead act no person by filing upon a piece of land acquires any ownership in the same. He obtains an inchoate title, which is only complete when he has resided upon the land the period of time

mentioned in the statute, and proved his right to the title, and paid for the same."

In the case of *Streeter vs. Rolph*, 13 Neb. 388, an action brought by Rolph against Streeter to recover the possession of a tract of land, Streeter had settled upon the land under the homestead law, made final proof and procured his entry certificate, which the commissioners of the general land office had attempted to cancel, Rolph procured judgment in the district court, which was upon appeal to the supreme court reversed, the supreme court saying :

" In any event the plaintiff in error (Streeter) has rights in the land itself which can only be determined in a proper action in a court of general jurisdiction, The defendant in error entered the land as a timber-claim in 1881, and claims the land under his certificate of entry.    Both parties thus claiming the land itself, forcible entry will not lie."

So in the case at bar both parties are claiming the better right to procure the title of this land from the government ; both parties are claiming the right to possess the land or parts thereof during the litigation, and the court has no jurisdiction to interfere by a preliminary determination of rights which can only be determined by the land department,

In the case of *Belk vs. Meagher*, 104 U. S. 279, Belk brought an action to recover the possession of a certain alleged quartz lode mining claim, which had been in the prior possession of another, under the mining laws, which gave the right to the locators "to have the exclusive right of possession and enjoyment of all the surface included within the lines of their location," which, the supreme court of the United States says, "is to continue until there shall be a failure to do the requisite amount of work within the prescribed time." By very statutory enactment, it will be seen, the locator, under the mineral law, was given "the exclusive right of possession and enjoyment of all the sur-

face" of his claim, a right which has nowhere been granted under the homestead law. Notwithstanding this right of exclusive possession on the part of another claimant, the supreme court held, with reference to Belk:

"If he actually held possession and worked the claim long enough, and kept all others out, his right to a patent would be complete. He had no grant of any right of possession. His ultimate right to a patent depended entirely on his keeping himself in, and all others out, and if he was not actually in, he was, in law, out. A peaceable adverse entry, coupled with the right to hold the possession which was thereby acquired, operated as an ouster, which broke the continuity of his holding, and deprived him of the title he might have got if he had kept in for the requisite length of time. He had made no such location as prevented the lands from being, in law, vacant. Others had the right to enter for the purpose of taking them up, if it could be done peaceably and without force."

Now, here it is substantially held that Belk might have acquired a right to prove up and acquire title to this mineral claim by actual occupancy during the time when another, by the law, had exclusive right of occupancy, but which right he did not actually exercise. In other words, it seems that the exclusive right of occupancy could not prevent another right attaching, if the holder of the exclusive right did not actually exercise his right by actual possession. If an entry could be made, peaceably, upon lands to which another had the exclusive right of possession, a right could be acquired which would be only subject to the existence of a better right on the part of an adverse claimant.

The court in this case says, in speaking of *Atherton vs. Fowler*, 96 U. S. 513:

"We also all agree that if a peaceable entry had been made on lands which had not been enclosed or improved, a good right might have been secured."

This, it is true, was said of the rights under the pre-emption law, in applying the same doctrine to the mineral law, but I will show hereafter, by the holdings of the land department, that the same right existed as to lands covered by a homestead entry, except as against the homestead entryman, and, certainly, it would also exist as against him if he had done an act which would not permit him to enter "any of said lands or acquire any right thereto," or if the parties were contestants for the better right to make entry of the land and the matter was undetermined in the land department.

Having now given my reasons for my opinion that the courts have no jurisdiction to entertain any action affecting the rights of parties contesting for a better right to be awarded the title to a tract of government land, excepting to restrain one party from interference with the actual possessions and improvements of the other, I desire now to show that there is nothing in the law or the rulings of the land department which would make Sproat a trespasser upon any right of Durland, whereby a court of equity could acquire jurisdiction to restrain a trespass of one party on the lands or possessions of another party. He is not only not a trespasser upon the possessions or right of possession of Durland, but he is in such position as that by virtue of his acts of settlement and improvement, if his allegations are true, and if his contention is true, which contention this court has no power now to determine to any extent one way or the other, he may, by the performance of all the requirements of the laws, procure the final receipt and patent for the tract of land in controversy. Would not an interference with the claim for the right to enter a tract of public land, an interference with the acts which he deems it proper and important that he should perform in complying with the law and in showing his good faith in

his efforts to remove the claims of the alleged fraudulent claimants to this tract of land, be an interference with the absolute and exclusive jurisdiction of the land department in its disposal of the public domain? It seems so to me, and for that reason I am unwilling to acquiesce with the jurisdiction sought to be exercised. Among other facts found by the court are the following :

"On April 21, 1893, Sproat filed in the land office at Oklahoma City an affidavit of contest against the entry of Woodruff and Durland, alleging that both Woodruff and Durland were disqualified from entering the land as a homestead; that on the 24th day of April, 1893, Sproat purchased from Lawrence his improvements upon the land, and on the same day went into possession of such improvements. On May 1, 1893, Sproat filed in the land office a contest against Durland for the land, and, as a ground of such contest, alleged that Durland was disqualified from entering the same by reason of having entered upon lands in Oklahoma subsequent to March 2 and prior to April 22, 1889, and further, that he, Sproat, was an actual settler upon said land prior to and at the time Durland filed his homestead entry."

In the tenth paragraph of Sproat's affidavit for a temporary restraining order he sets up the following:

"Upon the first day of May, 1893, this plaintiff filed in the United States land office at Oklahoma City an affidavit of contest against the said homestead entry of Otto C. Durland, duly corroborated, charging that the said Otto C. Durland, did, after March 2 and before noon of April 22, 1889, enter upon and occupy portions of the lands described in and declared open to settlement by the president's proclamation of March 23, 1889, opening said lands to settlement, and further charging that said Otto C. Durland was within said lands before and up to the hour of twelve o'clock, noon, of April 22, 1889, in violation of law, and further charging that the plaintiff was a homestead settler on the said land at and before the time that defendant made homestead entry thereon, and that such contest is now pending in the United States land office at

Oklahoma City. Said settlement was made and said contest was filed by this plaintiff in good faith and for the purpose of acquiring title to·said land."

This paragraph of the plaintiff's contention seems entirely to have been overlooked by the court in its findings of fact, but I cannot believe it should be disregarded. for it goes to the very basis of Sproat's claim of right of possession, and I can see no reason why, if he has a claim recognized by the land department as giving him a right to the present and ultimate use, enjoyment of, and title to this land, he should be abstractly held as a trespasser thereon by virtue simply of the claim of right inherent in the homestead entry of Durland. I consider this allegation of contest and of claim of prior right to the land by virtue of settlement as very material when the court insists in going beyond the question of jurisdiction, which has ended all similar actions, or actions on principle the same, and enters into an analysis of the rights of these parties, which can only be determined by the land department. If under the regulations and rulings of the land department Sproat could acquire any claim of right by virtue of his settlement or his acts performed, then. certainly, he cannot be held a tresspasser upon this land either as against the government or as against Durland. The holdings of the land department are to the effect that the right of a settler upon a tract of government land covered by a homestead entry of another attaches as such settler *eo instanti* upon the relinquishment of such prior entry

In the case of *Zaspel vs. Nolan*, 13 L. D. 148, it is held:

"You sustained the action of the local officers dismissing the protest. and held that Nolan being a settler on the land at the date of the filing of the relinquishment, his rights attached *eo instanti*, and are superior to those of a homesteader who enters the land immediately after the filing of a relinquishment,

citing *Wiley vs. Raymond*, 6 L. D. 246. From this decision Zaspel appealed.

"It appears from the record in the case that Nolan was a settler upon the land at the date of the filing of the relinquishment, and it is not claimed by the protestant that he was then or ever had been an actual settler on the land, but he contends that it was not necessary for him to be an actual occupant of the land, for the reason that the land being covered by his timber culture entry, he was as much in actual possession as if he were living upon the land, and, further, that the case should be determined by the rule announced in *Tilton vs. Price*, 4 L. D. 123, which was the rule in force when his homestead entry was made.

"The rule announced in the case of *Wiley vs. Raymond*, *supra*, to the effect that on the relinquishment of an entry the right of a settler then residing on the land attaches *eo instanti* and is superior to that of a homesteader who enters the land immediately after said relinquishment, is decisive of the issue presented in this case, and is not in conflict with the rule announced in *Tilton vs. Price*, 4 L. D. 123, relied on by the protestent."

The *Wiley vs. Raymond* case referred to was a case where Grassick made homestead entry on the land and Wiley upon the relinquishment and cancellation of the this entry made another homestead entry, and Raymond contested upon the ground of being a settler, at the instant of relinquishment, he having been a settler upon the tract of land before that time. The secretary of the interior sustained his claim and he was awarded the land. It will therefore be apparent that there is no difference in this regard whether the entry was a homestead or a timber culture entry.

Under this doctrine, then, (and we cannot controvert its correctness, because it is a matter of regulation within the exclusive control of the land department,) Sproat, if his allegations are true, was an actual settler on the land at the date of Durland's entry, and the

conflicting right between him and Durland can only be determined by the contest filed by him in the land office. But it is contended that the rule is changed, because Durland had the right of a preferred contestant, under section 2 of the act of May 14, 1880, (21 Stat. at Large 140.) It might be conceded that, on the face of the record, Durland had the preference right, yet, that would not be giving him such absolute right of possession of all the land as that he might eject a person, claiming by virtue of a *bona fide* settlement, therefrom. The regulations of the department do recognize Sproat as a prior settler, and there has been no decision of any court, so far as I have been able to find, and none is cited by the court in this case, which holds that a preference right is an equity in the land. If it was not an equity of sufficient force and validity as to deprive any and all other contesting claimants from a right to hold possession of all or a part of the land, then such equity is not sufficient to warrant the court in dispossessing Sproat by injunction. Sproat was upon the land, claiming the right by virtue of his settlement, at the time that Durland had made his filing. It may be that he anticipated the action which was taken by Woodruff and Durland; it may be that he knew that both of these parties were disqualified by reason of having violated the law; it may be that he desired to thwart the fraudulent entry on the part of Durland, who, under the form and fashion of inchoate right, called a "preference right," intended to, and was expecting to, violate the law. Had he not a right to anticipate, and thwart, such fraudulent conduct? Has it come to pass that the courts of this country must protect a fraudulent entryman, one who is alleged, by an affidavit duly corroborated, duly sworn to, to be a fraudulent entryman, merely because of the fact that, under the forms of the law, he may have a better right to the tract of land, if his entry is not

fraudulent, than the one who brings his fraudulent acts to the notice of the department of the interior for investigation? I cannot believe so, and, not believing so, I cannot assent to any such doctrine. I do not believe that the homestead entry carries appurtenant to it the right to dispossess all other claimants to the land, no matter by what form their contest may proceed. Neither do I believe that the right of a contestant bears any such power. If the homestead entry carries with it this right, by virtue of being of record, then, if Sproat had procured the relinquishment of Woodruff, Durland, not being a prior settler, might have been dispossessed by Sproat, notwithstanding the existence of his preference right, notwithstanding that, if his acts had all been valid, he would, under the law, have been ultimately absolutely entitled to the right to finally enter this land. It would be an absurdity to hold to such position; no court has so held, and I cannot. The rights of parties litigant, to government land, under such a construction, would depend upon mere jugglery, upon the caprice or whim of somebody who had an inchoate right, however fraudulent it might be. But it may be said that Sproat could not have placed his entry on the land, because of the existence of Durland's preference right. This is not the law, because it is not the practice of the land department, and these matters are within its regulation, and are binding until title passes.

In the case of *O'Conner vs. Hall*, 13 L. D., 34, Hall made timber culture entry. James O'Conner filed an affidavit of contest against the same and made application under the law to enter the tract. The entry was afterwards cancelled and Volney D. Throop was allowed to make entry. The matter was proceeded with to a hearing by the department requiring Throop to show cause, if any he could, why O'Conner was disqualified to make the entry and why the heirs of O'Con-

ner, he having deceased, should not be given a prefer-
ence in the entry of this land.

This is an illustration of the practice that pertains
in not requiring thirty days in which the preferred
contestant may enter to lapse before the entry of
another party may be made.

In the case of *Westenhaver vs. Dodds*, 13 L. D. 196,
will be found another case which exhibits the prac-
tice of the land department in allowing a third party
to make entry on a tract of land during the period of
the existence of the preference right of a preferred
contestant. This may or may not be the rule of the
land department. If it is the rule, then it cannot be
said that the preference right is recognized by the
department as bearing an equity which prevents any
other person from becoming in the regular way a
litigant before the land office for the right to make
the final entry. If it is not the rule, then it exhibits
the fact that the regulations must be too vacilliating
for us to establish a rule of equity thereon. In this
decision the highest branch of the land department
said:

"The act of May 14, 1880 (21 Stat., 140), provides
that when a claimant files a written relinquishment of
his claim in the local land office the land covered by
such claim shall be held as open to settlement and
entry. The second section of the act gives a contest-
ant who has procured the cancellation of such entry a
preference right to make entry for the land, provided
he does so within thirty days after receiving notice
of such cancellation. If the contestant applies to
make entry within the time allowed and some other
person has, in the meantime, made entry, the prior
entryman should be required to show cause why his
entry should not be cancelled on account of its con-
flict with the preference right of the contestant. * * *

"I am of the opinion that the rights of these re-
spective parties can be determined only by a hearing
had for that purpose."

Nor was it necessary that Sproat should have made an application at the land office to enter this tract of land and tendered the fees for such entry to the register and receiver within three months from the date of the cancellation of the Woodruff entry, and from the date that his settlement attached upon the cancellation of the prior entry, in order to maintain his status as a prior settler in his contesting claim for the better right to enter this tract of land and acquire the title thereto.

In the case of *Rumbley vs. Causey*, 16 L. D. 266, the secretary says:

"After pointing out the particulars in which your decision is contrary to the evidence, it is alleged that you erred in not sustaining the motion of the defendant to dismiss said action, for the reason that plaintiff did not apply to enter said tract, and tender the fees for such entry to the register and receiver within three months from the date of his alleged settlement. There is no merit in this point. Land covered by one entry is not subject to another, at the same time, and it would therefore have been an idle ceremony for Rumbley to have applied to make entry for the land already covered by the entry of Causey, as an application to enter land not subject to entry at the time the application is made, confers no rights upon the applicant.

"Rumbley initiated contest against the entry of Causey, within three months after his (Rumbley's) settlement upon the land, and by such proceeding preserved his settlement rights as effectually as he could by an application to enter, as, before his entry could be allowed, that of Causey must be removed from the land. A prior settler who initiates contest within three months after settlement, and who applies to enter within thirty days after receiving notice that he has succeeded in his contest, is in time. It would have been error, therefore, to have granted defendant's motion to dismiss the contest, upon the grounds stated by him."

See also *Huntsbarger vs. Eickman*, 16 L. D. 270.

This being the practice in the land department, I think also controls this case, and I think that the rights of the parties can only be determined after hearing in the land department, and their possessions ought not to be interfered with by the courts, nor they ought not to be allowed to interfere with each other to the detriment of the one or the benefit of the other, until the land department has finally passed upon the case.

The question as to whether a settlement right can be acquired by the personal act of the party or by the procurement of another has no place in this case. The findings of fact show that Sproat did actually settle, and there are no decisions which hold that a settler may not purchase the improvements of another or procure another person to make improvements for him. It is only the settlement, the actual attaching of himself to the soil, that he is required to do personally. The bounty of the land laws is given as much to the decrepit, to the invalid, to the cripple, as they are to the strong, the robust and the powerful. If a settler might not purchase the improvements of another or might not procure another to place them there, the cripple, the invalid and the decrepit might be entirely deprived of the government's bounty. This was never intended.

I do not believe that [Sproat was a trespasser upon this land, nor can I find anything in any of the decisions cited by the learned court that indicate this. The first decision cited is that of the opinion of the attorney general ( McVeagh,) found in 1 L. D. 30. This is also presented by the supreme court of the United States in *Sturr vs. Beck*, and I will consider it in reviewing that decision. The second is the case of *Oliver vs. Thomas*, 5 L. D. 289. None of the language of that decision is quoted in support of the proposition, but I have examined it carefully and find no claim there, to

either of the claimants being a trespasser. The department, through that eminent jurist, Secretary Lamar, determined the question of the prior rights of the parties litigant, and held that no rights under the pre-emption law are acquired by the settler to lands segregated from the public domain. This is a proposition that has hardly been controverted in recent years, but it is not this case, for the reason that when Woodruff's entry was cancelled the land was released from segregation, and, as we have found before, the right of a settler at that moment could immediately attach to the land. The third decision cited is that of *Gudmunson vs. Morgan*, 5 L. D. 147. There is no language in this decision which would indicate that Sproat would be held by the department to be a trespasser because of the fact of his being upon the land during the existence of Woodruff's entry. On the contrary, it is said in the syllabus, which seems to be the point of the case :

"As between two settlers on land covered by the entry of another, priority of right is held to be with the one who first settled and filed application for the land, together with a relinquishment of the former entryman."

This not only does not hold by application to this case that Sproat was a trespasser, but on the contrary holds that excepting as to Woodruff, he, Sproat, might acquire a valid, subsisting and better right to make entry of this tract of land by virtue of his settlement thereon, although made while the land was covered by the existing entry of Woodruff. It is only as against the record entryman that a valid and better right to make entry of the land may not be acquired by settlement on the land during the existence of the entry. As between other parties the priority of settlement may determine priority of right. In this case, then, Sproat being a settler on the land, and Kate A.

Woodruff having relinquished her right of entry, and Lawrence having sold his improvements to Sproat, the only better right that could attach to the land would be that of Durland, by virtue of his preferred right of entry; but, as we have seen, Sproat might contest (I mean contest in the sense of oppose or litigate) that preference right of Durland by his, Sproat, placing an entry upon the land, even during the existence of the thirty days preference right on the part of Durland, and if he might contest Durland's preference right by placing an entry of record for the land prior to Durland's entry, why may he not also contest it by his claim of prior settlement, which may exist and be valid as against all other persons than the record entryman at the date of such settlement? And if Sproat's better right may exist at all, how can this court say, by a preliminary determination of the matter in advance of the action of the land department, that it does not exist? If Durland has done an act, as Sproat alleges he has, which absolutely disqualifies him from making entry of this land, then he had a preference right only in name, because he had no capacity or qualification to exercise such right, and Sproat could regard it as if it did not exist at all. If it did not exist at all in fact, it did not exist in law, and its existence at the moment that Sproat's settlement right could attach upon the relinquishment of the Woodruff entry can be determined only by the hearing in the land department. If it was possible under the rulings of the land department in the administration of the land laws that a settlement right on the part of Sproat could be acquired by his settlement upon this land while covered by the Woodruff entry as against all other parties than Woodruff, then a superior right must be found to exist on the part of Durland in this case before it can be held that no right on the part of Sproat was acquired by such settlement,

and certainly pending such controversy the right would not exist in Sproat's adversary to dispossess him from a possession actually and peaceably acquired. There is nothing in the law which prohibits Sproat from occupying, residing upon and improving the land or a part of it, if he so desires, during the existence of this land litigation with Durland, and if there is nothing in the law which prohibits such occupancy, and nothing in the law which gives to Durland any ownership in the land, then Sproat could not be a trespasser. If Sproat violated no law and did not trespass upon any property right, then he violated no right, and if he violated no law and violated no right, no person could enforce any remedy against him; for the law gives no remedy where no law and no right are violated.

This case specifically cites the case of *Geer vs. Farrington*, 4 L. D. 410, where it is held that while no right by virtue of a settlement can be obtained as against the record entrymen or the United States, yet as between such settlers priority of settlement will be considered in determining priority of right. This is another patent exposition of the policy of the government in inducing by all proper means parties who desire, under any enactment, to procure the right of final entry to government of land, to speedily occupy and improve the same, and gives the reward to him who first settles upon, cultivates, and improves the land irrespective of the technical question, which I think is not in this case, as to whether or not the act segregates the land from the public domain, a proposition which is conceded upon conceding the existence of an entry.

The fourth case is that of *Sturr vs. Beck*, 133 U. S. 541. In this case John Smith made homestead entry on the land in controversy on the 28th of March, 1879. On or about the 15th day of May, 1880, the plaintiff,

Daniel Sturr, who was an occupant of an adjacent tract, without any grant from Smith, the occupant and claimant, went upon the homestead claim of Smith and located a water right on Smith's homestead, and dug a ditch thereon, diverting the water from its natural channel and conveying it on his own, Sturr's homestead. After final entry, Smith sold to Beck, the defendant. Beck interfered with Sturr's using the water by means of this artificial channel, and Sturr brought an action to enjoin such interference. It is in this case that the opinion of Attorney General McVeagh, cited in 1 L. D. 30, is also found, and in which this language is used with reference to the homestead right :

"This right amounts to an equitable interest in the land, subject to the future performance by the settler of certain conditions (in the event of which he becomes invested with full and complete ownership;) and until forfeited by failure to perform the conditions, it must prevail not only against individuals, but against the government."

There is no contention but what this is the law, but there is nothing in this which recognizes that the homestead right carries with it any such equity as will give the courts jurisdiction to dispossess another claimant for the land, from a part of the land, until after the title has passed from the government. It is, in equity, "subject to future performance, by the settler, of certain conditions," and it is that very subjection that renders the equity an inchoate one, one which slumbers during the existence of a controversy in the land department, and awakens by relation back to the moment of its existence, with all the powers of a vested right, after the conditions have been performed and the title procured. It is worthy of note that, in the conclusions of law of the court below, it is held that Smith had the prior right to that of Sturr, by virtue "of his homestead-filing, or entry, made on

the 25th day of March, 1879, he having made final proof for entry thereafter." It was the fact of his having made final proof and entry thereafter which gave him the vested right, which he might have enforced in the court, of having the water flow in the regular channel of the creek, over and across the land. If it had been held in this case that Smith, during the existence of the homestead entry, as it existed prior to final proof, had such a vested right as that he might divest even Sturr himself, who claimed no right to the land, of the right to use the water as he did, then I would consider the case in point. As it is, I do not.

The similar nature of the vested right of a homestead and of a pre-emption claimant are clearly recognized by the supreme court in this case, where it cites the case of *Shepley vs. Cowan*, 91 U. S. 130, which is a pre-emption case, and says:

"And as to the mere settlement, with the intention of obtaining title under the pre-emption laws, while it has been held that no vested right in the land as against the United States, is acquired until all the prerequisites for the acquisition of title have been complied with, yet, rights in parties as against each other were fully recognized as existing, based upon priority in the initiatory steps, when followed up to a patent. 'The patent which is afterwards issued, relates back to the date of the initiatory act, and cuts off all intervening claimants.' *Shepley vs. Cowan*, 91 U. S. 330, 337."

From a reading of that decision it seems to me it is clearly shown, not that the supreme court of the United States mean that during the existence of Smith's homestead entry he had an equity which would warrant him in enjoining Sturr from any actual possession (which view alone could make it applicable to this case in the present condition of the parties), but that after final proof had been made, final

certificate had issued and patent given, that then his conditional equity would ripen into a vested right which would relate back and, by the relation back rather than by present existence during the life of the entry, before proof, cut off all intervening claimants.

Again, congress, by the act of February 25, 1885, (23 Stat. at Large, 321), passed an act, the first section of which defined what was an unlawful occupancy of the government land, as follows:

"That all inclosures of any public lands in any state or territory of the United States, heretofore or to be hereafter made, or erected, or constructed by any person, party, association, or corporation, to any of which land included within the inclosure of the person, party, association, or corporation making or controlling the inclosure, had no claim or color of title made or acquired in good faith, or by an asserted right thereto, by or under claim, made in good faith with a view to entry thereof at the proper land office under the general laws of the United States at the time any such inclosure was or shall be made, are hereby declared to be unlawful, and the maintenance, erection, construction, or control of any such inclosure is hereby forbidden and prohibited ; and the assertion of a right to the exclusive use and occupancy of any part of the public lands of the United States in any state or in any of the territories of the United States, without claim, color of title, or asserted right as above specified as to inclosure, is likewise declared unlawful, and hereby prohibited."

What was the necessity of passing such an act if, as a matter of law, any person who had not shown some legal means of acquiring title to the land would be a trespasser upon such lands?

If the person having such inclosure before this act was passed was not a trespasser as against the government which owned the land and had the fee simple title thereto, certainly he could not be a trespasser against a party who had not any ownership therein, as the courts have said, but a mere inchoate right or

equity, subject to conditions. I construe this act to mean that but for it persons settling upon the government land, without claim of right, and occupying any of the government land, were not trespassers as against the government. I cannot believe that congress was engaged in useless legislation, and this would be useless if the proposition that such settler was a trespasser were true. It will be noticed, however, in defining a trespass upon government land, there is excluded from such prohibition any person who has "claim, or color of title, made or acquired in good faith, or an asserted right thereto, by or under claim made in good faith with a view to entry thereof at the proper land office, under the general laws of the United States." No exception from the ban of the law could be made broader than this. It does not mean that the person must come within any prescribed or technical rules of judicial construction, but it need only be "by or under claim made in good faith with a view to the entry thereof." Is not the claim of Sproat made "in good faith with a view to the entry thereof?" It does not need to be prior settlement, it does not need to be a preferred or preference right, but it needs only to be a claim made in good faith, with a view to final entry of the land. What right then have the courts in the exercise of equity powers to extend against the plaintiff a prohibition which the law never intended? Is it the proper exercise of equity jurisdiction to brand the claimant as a trespasser when the law clearly exempts him from such odium? If that is equity the sooner we get back to the rigors of the common law the safer will the rights of the people be.

This act of February, 1885, just above cited, came before the supreme court of California for construction in the case of *Whittaker vs. Pendola*, 20 Pac. Rep. 680, where the court said:

"The defendant, not having shown any capacity in himself to acquire the government title to the demanded premises, nor any effort or intention to do so, stands in the position of a mere naked trespasser upon the public domain, with an inclosure erected and maintained contrary to the express provisions of the act of congress of February 25, 1885 (Stat. 1884–5, p. 321), and the main question in the case is whether, by such unauthorized inclosure, he can prevent a homestead entry of the land by a citizen of the United States who goes peaceably upon a portion of the tract and in other respects complies with the law."

And under a particular statute of California giving a remedy by a possessory action in such case the court held that he could not by such acts prevent the homestead entryman from going upon the land, but rather should put the entryman in possession.

The language of the court there is inferentially to the effect that if the defendant had shown capacity in himself to acquire the government title to the demanded premises, or an effort or intention to do so, he would not be a trespasser within the meaning of this law.

Is there anything in this case which shows that Sproat did not have the capacity, that he was not qualified to make entry? His capacity and his qualifications are not disputed.

Is there anything in this case to show that Sproat was not making any effort and had no intention of acquiring the government title to this tract? Certainly not, but on the contrary it is shown that he had purchased the actual improvements placed upon the land by another party, and had made actual settlement thereon; that he had filed two affidavits, duly corroborated, charging both Durland and Woodruff with a most serious violation of the law—so serious, if true, as to render them disqualified to ever make entry of this land. He had done everything which he could

do to show his "good faith, with a view to entry thereof, at the proper land office," and, having done so, he could not be a trespasser upon the land merely because of the existence of Durland's entry, and he could not be enjoined from this ground. When, however, he did attempt to intrude on the possession of another, no matter how tainted with fraud his claim might be, he should be restrained from such intrusion pending the litigation in the land department.

Nor do I believe that there is anything in the circumstances of the administration of the land laws of Oklahoma which warrants our courts here in the exercise of their equity powers in extending the well defined jurisdiction of courts of equity and the well defined jurisdiction of the courts in this case. We are not starting out here upon a new equity jurisprudence, but rather should be following the doctrine of equity which are as clearly defined as the laws themselves.

"Since the combination of legal and equitable remedies in one judicial proceeding which has been effected in many of the states, the notion seems to have been revived, somewhat vague and undefined perhaps, but still widely diffused among the legal profession, that equity is nothing more or less than the power possessed by judges—and even the duty resting upon them—to decide every case according to a high standard of morality and abstract right, that is, the power and duty of the judge to do justice to the individual parties in each case. This conception of equity was known to the Roman jurists, and was described by the phrase, *arbitrium boni viri,* which may be freely translated as the decision upon the facts and circumstances of a case which would be made by a man of intelligence and of high moral principle; and it was undoubtedly the theory in respect to their own functions commonly adopted and acted upon by the ecclesiastical chancellors, during the earliest periods of the English court of chancery. It needs no argument to show that if this notion should become universally accepted as

the true definition of equity, every decision would be a virtual arbitration, and all certainty in legal rules and security of legal rights would be lost." Pomeroy's Eq. Jurisprudence, § 43.

Again, in § 46, the same author in speaking of the extravagant conceptions of old writers and judges as to the system of equity jurisprudence which now exists and has existed, says:

"These definitions attribute to equity an unbounded discretion, and a power over the law unrestrained by any rule but the conscience of the chancellor, wholly incompatible with any certainty or security of private right. For the purpose of illustrating these loose and inaccurate conceptions, I have placed in the foot-note a number of extracts taken from the earlier writers."

Then following, in § 47, he says:

"It is very certain that no court of chancery jurisdiction would at the present day consciously and intentionally attempt to correct the rigor of the law or to supply its defects, by deciding contrary to its settled rules, in any manner, to any extent, or under any circumtances, beyond the already settled principles of equity jurisprudence."

I can see in all the facts and circumstances of this case no reason for going beyond the clearly defined jurisdiction of the courts with reference to the regulation of parties upon tracts of government land, for the ultimate title to which all are contesting claimants.

Entertaining these views it is unnecessary for me to express my opinion upon the other matters decided.